T.C. Memo. 2018-101

UNITED STATES TAX COURT

GREGORY RAIFMAN AND SUSAN RAIFMAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3897-14.                          Filed July 3, 2018.

Brian G. Isaacson, for petitioners.

Aimee R. Lobo-Berg and Catherine J. Caballero, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, Judge:  By notice of deficiency dated November 21, 2013,

respondent determined deficiencies in the Federal income tax of petitioners,

[*2] Gregory and Susan Raifman, for taxable years 2004, 2005, 2006, and 2008

(years at issue) and accuracy-related penalties under section 6662 as follows:[1]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $849,029 | $169,806 |
| 2005 | 184,489 | 36,898 |
| 2006 | 221,279 | 44,256 |
| 2008 | 16,509 | 3,301 |

The Raifmans timely petitioned this Court for redetermination.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2]The Raifmans have a related case before this Court: Raifman v. Commissioner, docket No. 12144-11L (CDP case). The CDP case results from respondent's attempt to collect the Raifmans' unpaid tax for 2003. There the Raifmans claimed entitlement to theft loss deductions for 2006 that, if sustained, they intend to carry back to 2003 to eliminate their unpaid tax balance. See, e.g., sec. 172(a), (b)(1)(E), (d)(4).
On September 20, 2011, respondent filed a motion for summary judgment (motion) in that case, arguing, as relevant here, that the Raifmans' sale of stock did not result in a deductible theft loss. On August 7, 2012, this Court released Raifman v. Commissioner, T.C. Memo. 2012-228, wherein we declined to grant respondent's motion and held that disputed issues of material fact necessitated trial.
On April 29, 2016, the parties filed a joint stipulation to be bound with respect to the CDP case. In the stipulation to be bound the parties agreed that the outcome of the present case will resolve all issues presented in the CDP case.
(continued...)

**[\*3]**   After concessions and stipulations,[3] the issues remaining for decision are

----

[2](...continued)
Accordingly, on June 20, 2016, upon due consideration of the parties' stipulations, we ordered that the CDP case be held in abeyance pending the entry of decision in the present case.

[3]The Raifmans have stipulated or did not address--at trial or on brief--a number of adjustments determined in the notice of deficiency.  Accordingly, the Raifmans have, or are deemed to have, conceded the following issues and adjustments.  See Rule 34(b)(4); Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003); Leahy v. Commissioner, 87 T.C. 56, 73-74 (1986).
For 2004:  a $4,970,743 increase in capital gains; a $35,034 reduction in a deduction for mortgage interest claimed on Schedule A, Itemized Deductions; a $305,631 reduction in a claimed deduction for investment interest claimed on Schedule A; and the denial of a deduction of $3,005 claimed on Schedule F, Profit or Loss From Farming.
For 2005:  a $51,749 reduction in a claimed mortgage interest deduction and a $593,784 reduction in a claimed investment interest deduction.
For 2006:  a $664,384 reduction in a claimed investment interest deduction and a $79,411 increase to income to reflect the unreported receipt of a State tax refund.
For 2008:  various computational adjustments.
The Raifmans, however, did not concede their dispute with respect to the statutory interest determined in the notice of deficiency.  We observe that this Court's jurisdiction to redetermine a tax deficiency does not permit the Court to review or abate statutory interest absent the taxpayer first exhausting his or her otherwise available administrative remedies.  Sec. 6404(h); Rule 280; Bourekis v. Commissioner, 110 T.C. 20, 26 (1998); cf. Bennett v. Commissioner, T.C. Memo. 2017-243, at \*6-\*9.  The Raifmans neither alleged receipt of, nor entered into evidence, any final determination wherein respondent rejects their request for abatement of interest.  Similarly, the Raifmans neither alleged nor entered into evidence any proof that they have even filed for or otherwise formally requested from respondent an abatement of interest.  Accordingly, we hold that this Court lacks jurisdiction to hear the Raifmans' attempt to seek a redetermination of interest under sec. 6404(h).  See Carter v. Commissioner, T.C. Memo. 2014-142, at \*5.

**[*4]** whether the Raifmans are: (1) entitled to deduct theft losses totaling

$10,798,061 for their 2008 tax year;[4] (2) entitled to a long-term capital loss

deduction of $400,000 for their 2008[5] tax year; and (3) liable for the section

6662(a) accuracy-related penalty for each of the years at issue.

---

[4]The notice of deficiency disallowed a $15,160,607 theft loss deduction for
for the Raifmans' tax year 2008.

In their petition the Raifmans revised their claimed theft losses to reflect the
amount above. This amount remaining at issue comprises a $3,750,000 loss
arising from their participation in the Derivium program; a $2,475,000 loss arising
from their participation in the ClassicStar program; a $1,934,084 loss arising from
their investment in the Real Return Fund; and a loss of $2,638,977 arising from
their investment in the Secured Lending Fund.

[5]The Raifmans initially claimed this $400,000 loss deduction as a
component of their $15,160,607 theft loss deduction claimed for tax year 2008. In
the notice of deficiency, respondent disallowed any deduction for the full amount
of that theft loss. The Raifmans now argue this $400,000 amount was a properly
deductible capital loss for their tax year 2009. The Raifmans' 2009 tax year,
however, is not before the Court. Additionally, we find the record lacks facts
sufficient to enable us to consider the implications of the Raifmans' 2009 tax year
with respect to our redetermination of the deficiencies properly before this Court.
See Hill v. Commissioner, 95 T.C. 437, 439-440 (1990). Accordingly, our
jurisdiction over this loss extends only to reach the claim made on the Raifmans'
2008 tax return.

We observe that the Raifmans have also claimed this loss deduction in a
parallel refund suit brought before the U.S. Court of Federal Claims, with respect
to their tax year 2009. On May 15, 2014, the U.S. Court of Federal Claims stayed
all proceedings in that case until this Court renders a decision in the present
matter.

**[*5]**                                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of

facts and the attached exhibits are incorporated herein by this reference. The

Raifmans[6] were married and resided in California at all times relevant to this case.

I.      The Beginning

A.      Background

Mr. Raifman is a graduate of the University of Michigan and the

Georgetown University Law Center, where he earned a bachelor of arts degree in

economics and history and a juris doctorate, respectively. Mr. Raifman began his

professional career as a judicial law clerk serving the U.S. District Court for the

Southern District of Georgia. Following his clerkship, Mr. Raifman took

successive positions at the law firms of Latham and Watkins, and Skadden, Arps,

Meagher and Flom. At those firms Mr. Raifman gained significant exposure to,

and practiced in, the fields of high-yield debt financing, "hostile takeovers", and

corporate mergers and acquisitions. Mr. Raifman developed skills in these fields,

---

[6]The Raifmans engaged in the transactions discussed herein both personally
and by way of wholly owned pass-through entities, notably Helicon Ltd.
(Helicon), their entity organized in the Cayman Islands, and the Gekko Group,
LLC, or Gekko Holdings, LLC (Gekko). For clarity we distinguish the individual
Raifmans, Gekko, and Helicon only where necessary. We otherwise refer to all as
the Raifmans.

**[*6]** and in due time he pivoted his legal career to focus his work therein: first by taking a position as counsel at Montgomery Securities, where he specialized in facilitating initial and secondary public offerings for his clients, and later by founding his own law firm and numerous venture capital investment and advisory firms primarily dedicated to investing in computing and information technologies and the legal issues arising therefrom.

It was Mr. Raifman's work in the capital markets and the technology field that led him to found Mediaplex, Inc. (Mediaplex). Mr. Raifman served as president, CEO, and outside legal counsel of Mediaplex, and in each role he was compensated by way of stock and options.

Mrs. Raifman graduated from Barnard College, where she received a bachelor of arts degree in English. She subsequently earned master's degrees in both business administration and urban planning from the University of California, Los Angeles. Mrs. Raifman, like her husband, experienced success in the corporate world, where she was an executive in marketing and promotions for a number of public companies before later taking a similar role at Mediaplex.

In the fourth quarter of 1999 Mr. Raifman guided Mediaplex's initial public offering. Mediaplex shares debuted to significant market demand and were at one point valued as high as $104 per share. At that time the Raifmans owned roughly

**[*7]** 46.5% of Mediaplex, and as a result of the market's valuation of Mediaplex, the couple's wealth was significantly bolstered during that initial offering period. The Raifmans, however, were unable to immediately capitalize on Mediaplex's success as their holdings were restricted and not readily marketable. Shortly after Mediaplex went public, the internet and technology markets tumbled, and as a result the per-share value of Mediaplex stock dropped below a dollar.

In October 2001 Valueclick, Inc., a competing internet advertising firm, purchased Mediaplex. As a result of that purchase, approximately 2 million of the Raifmans' Mediaplex shares were converted to interests in Valueclick. Valueclick retained Mr. Raifman's services as a member of the Valueclick board of directors and, as part of his compensation for performing in this role, provided him over 600,000 nonqualified options for the purchase of Valueclick stock.

By 2003 the couple's personal and professional lives began to evolve: Mrs. Raifman had left the workforce, and Mr. Raifman had resigned from his position on the Valueclick board. In tendering his resignation Mr. Raifman exercised his nonqualified stock options, purchasing 668,363 shares of Valueclick stock at $1.22 per share. As the market price at that time was roughly $3.43 per share, the Raifmans realized ordinary income of $2.21 per share, or $1,476,480 total.

[*8]  Mr. Raifman did not consult with any professional advisers or tax professionals before exercising his nonqualified options.

### B.  Objectives

Following the exercise of the Valueclick options, the Raifmans wished to manage their wealth in a sustainable manner that would generate an income stream sufficient to sustain their then-current lifestyle for the remainder of their lives.  To this end, the Raifmans envisioned the assembly of a portfolio that would function as their personal "endowment", providing them annual disposable income of approximately $400,000 net of all expenses and taxes and generating 10% annual growth.  The Raifmans were aware, however, of the fact that nearly all of their wealth was concentrated in Valueclick stock.  Informed by their earlier experience with Mediaplex, the Raifmans knew that a portfolio composed of positions concentrated in a single company posed a hazard to one's wealth and that to manage their wealth in a manner sufficient to meet their objectives their investment portfolio required diversity.

The Raifmans began to seek help in developing their course of action.  Initially they turned to family friend and neighbor Steve Glaser.  Mr. Glaser was a former auditor who was operating a catering company while moonlighting as a financial consultant.  Mr. Glaser informed the Raifmans that they would need to

[*9] initially fund their "endowment" with, at minimum, $10 million. Mr. Glaser possessed neither the means nor wherewithal to deliver them the substance of their objectives, but believed he knew someone that did possess such ability and means: Joe Ramos.

Both Mr. Glaser and Mr. Ramos had previously worked for Arthur Andersen, where Mr. Glaser had supervised Mr. Ramos' work as an auditor. Mr. Ramos was a licensed certified public accountant (C.P.A.) during his employment at Arthur Andersen, but by summer 2003 his career trajectory had turned toward the securities brokerage and financial planning industries. Although Mr. Ramos had allowed his C.P.A. licence to lapse, he was a certified financial planner and operated his own investment advising firm: Ramos Financial d.b.a. Private Capital Management (Ramos Financial). Mr. Glaser knew that Mr. Ramos' financial planning practice catered to high net worth individuals and used unique means and methods for meeting client objectives. For these reasons Mr. Glaser recommended that the Raifmans meet with Mr. Ramos.

While Mr. Ramos independently owned and operated Ramos Financial, he was also a "managing director"--an affiliate or, functionally, a franchisee--of the Private Consulting Group (PCG). PCG was an investment advisory and securities brokerage firm founded by Robert Keys in the late nineties. Robert Keys designed

**[\*10]** PCG to cater to the interests of high net worth individuals and did so by offering, in addition to standard brokerage and advising services, access to designer opportunities for the empowerment of one's "true wealth". Notably, PCG provided its clients access to numerous opportunities that enabled clients to "reduce, defer, and in some cases avoid" tax and to transform these tax efficiencies into additional sources of income, wealth, and equity.[7]

---

[7]To this end, PCG offered a variety of tax efficiency strategies each tailored to address the spectrum of issues that PCG had found to routinely cause client concern. For the client interested in liquidating appreciated stock, PCG offered tax-efficient methods of asset monetization that could convert the client's "paper profits" to currency. For the client concerned with retirement, PCG offered access to a "tax-to-equity conversion" plan designed to recover the client's income tax paid for prior years and place that recovered tax into "exclusive vehicles" to fund the client's retirement. For the client concerned about estate tax and asset protection, PCG offered access to leaders in the field of establishing offshore "tax-advantaged" vehicles designed to protect an individual's wealth from "unscrupulous creditors and frivolous lawsuits" and minimize if not eliminate tax.

Should these strategies appear suspect to skeptical potential clients, PCG offered comfort, noting that "many" of its true wealth strategies had received a "should" or "more likely than not" tax opinion from a "major" accounting firm or law firm. Additionally, PCG boasted that the "wealth design" professionals in its affiliated network--advisers, lawyers, and accountants--were intimately familiar with successfully implementing PCG's true wealth strategies, and would be at the immediate disposal of PCG, its franchisees, and their clients as necessary.

[*11] C.     Mr. Ramos and His Plans

       1.     The Derivium Program

Before meeting the Raifmans, Mr. Ramos had been briefed by Mr. Glaser with respect to the Raifmans' objectives. Accordingly, Mr. Ramos prepared a customized presentation identifying the strategies he believed best suited to provide the desired results. In July 2003 Mr. Ramos, armed with this presentation and his PCG-affiliate marketing materials, met with the Raifmans and pitched to them a variety of proposals and investing strategies that ranged from the conservative to the nontraditional. Mr. Ramos reviewed each proposal in detail with Mr. Raifman and Mr. Glaser, and the three collaborated in weighing the risks and rewards of each proposed strategy. Of these Ramos proposals, Mr. Raifman was particularly intrigued by a nontraditional "loan"-based strategy proposed by Mr. Ramos: the 90% stock "loan" program (Derivium[8] program).

Mr. Ramos was introduced to the Derivium program through his affiliation with PCG. Derivium was one of PCG's strategic alliance partners, and

---

[8]Derivium Capital, LLC, Derivium USA, Bancroft Ventures, Witco Services, Ltd., and Optech, Ltd., were entities directly related to Charles Cathcart and were the brand names under which Mr. Cathcart peddled the 90% stock loan program. See Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC), 716 F.3d 355, 359 (4th Cir. 2013); General Holding, Inc. v. Cathcart, 2009 U.S. Dist. LEXIS 130777, at *12-*14 (D.S.C. July 29, 2009). For clarity we refer to all as Derivium.

[*12] implementing the Derivium program's asset monetization strategy was integral to effecting a tax-efficient, true wealth optimization plan for PCG's clients.

The Derivium program was tailored toward individuals, such as the Raifmans, who held concentrated positions in a single marketable stock and wished to generate liquidity without triggering a taxable event. The Derivium program facilitated this monetization of stock by "lending" program participants up to 90% of their stock's fair market value. In return participants would surrender to Derivium the ostensibly leveraged stock as "collateral" and would accrue interest on the loan principal over the life of the loan.[9] Participants were prohibited from making any payments before loan maturity and, similarly, Derivium was prohibited from calling the loan before maturity. Most importantly, the loans were nonrecourse to the participant.

Because a Derivium loan was nonrecourse, a participant had no personal liability for principal or interest and could instead choose--for example, should the

_____

[9]Accordingly, the terms of the program agreement provided Derivium the unfettered right and power to "assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of" the collateral during the loan term.
To the extent relevant, the record before us establishes that Derivium's hedging strategy consisted of investing in startups founded or run by individuals related to the principals of Derivium. These startups eventually failed.

[*13] value of the participant's stock drop over the agreement's term--to default and cede the collateral to Derivium. Alternatively, upon maturity of the loan, participants could pay their balance due and request return of their collateral, or renew and refinance the loan for an additional term in order to monetize any appreciation of the collateral that occurred during the initial loan term. (We will refer collectively to these three choices as the alternatives to payment.)

Mr. Raifman and Mr. Glaser recognized that the Derivium program featured an inherent risk, specifically, the sustainability of its operations and its ability to perform on its potential obligations related to the Raifmans' alternatives to payment. Mr. Ramos explained that he, too, was initially skeptical with respect to Derivium's proprietary hedging "strategy" and readily admitted he was not privy to any specific details or mechanics of Derivium's proprietary hedging strategy, but he noted that, all sustainability risks considered, the present value of the tax savings and rate arbitrage[10] promised by the Derivium program functionally eliminated the Raifmans' exposure to risk.

---

[10]That is, these presumably tax-free loan proceeds would enable the Raifmans to currently monetize 90 cents on the fair market value dollar of their Valueclick stock, far better than the estimated 75 cents of the same resulting from a market sale.

**[*14]** Although the Raifmans chose to implement a diverse set of strategies to achieve their objectives, they ultimately also chose to participate in a series of Derivium transactions in order to jump-start their planning.

Before engaging in their first Derivium transaction, the Raifmans directed Mr. Ramos and Mr. Glaser to meet an estate planning attorney and C.P.A. with whom the Raifmans had previously worked, to solicit his opinion with respect to the claimed tax benefits of the Derivium program.[11] The attorney declined to provide them with his approval of the Derivium transaction's purported tax characterization but skeptically recommended that, should the Raifmans choose to participate in the Derivium program, they limit the extent of their participation and execute these transactions in a piecemeal fashion.

The Raifmans sought no further legal or tax advice with respect to the Derivium program and never met or otherwise engaged with any agent, representative, or other employee of Derivium.

In August 2003, roughly a month after first meeting Mr. Ramos and hearing his initial pitch, the Raifmans decided to go forward with their first Derivium

---

[11]The record appears to indicate that this attorney was Arnold Zippel, whom the Raifmans had previously engaged in order to establish a trust. The record contains no further facts with respect to the Raifmans' relationship with Mr. Zippel.

[*15] transaction and transferred 159,000 shares of Valueclick in exchange for $1,260,336, an amount representing 90% of that stock's fair market value.

On September 4, 2003, the Raifmans formally retained Mr. Ramos as their investment adviser. Later that month the Raifmans engaged in their second Derivium transaction, this time exchanging 161,000 shares of Valueclick for $1,362,804, an amount representing 90% of the stock's fair market value.

In July 2004 the Raifmans entered into a third Derivium transaction by transferring 300,000 shares of Valueclick in exchange for $2,810,476, an amount representing 86% of that stock's fair market value.[12]

In November 2004 the Raifmans engaged in their final Derivium transaction, this time exchanging 200,000 shares of Valueclick for $2,160,267.

---

[12]The Raifmans executed this Derivium transaction through their wholly owned Cayman Islands entity, Helicon. This Derivium transaction was part of an offshore tax-advantaged asset protection plan arranged through Mr. Ramos by Tim Scrantom, a PCG-affiliated wealth-design professional and attorney.

The Raifmans organized Helicon and contributed to that entity 300,000 shares of Valueclick stock. The Raifmans then caused Helicon to engage in a Derivium transaction and route the proceeds of that transaction to a domestic entity, Khronos Capital, Inc. (Khronos). Khronos then lent the Raifmans $2,795,000; in exchange, to secure this loan, the Raifmans provided Khronos a deed of trust over their home. The Raifmans subsequently routed this money back to Helicon, along with the proceeds of a more conventional home equity loan provided by Wells Fargo.

- 16 -

**[*16]** 2. The ClassicStar Program

During his initial July meetings with the Raifmans, Mr. Ramos undertook a review of the Raifmans' 2003 tax items and the income tax returns they had filed for years past. From this review Mr. Ramos ascertained that the exercise of Mr. Raifman's nonqualified Valueclick options exposed the Raifmans to a potential $405,670 income tax liability for the 2003 tax year. His discovery of this potential liability led Mr. Ramos to propose that the Raifmans explore potential "tax-to-equity" strategies that might enable them to defer recognition of this ordinary income and allow them to recapture income tax paid for years past.

Mr. Ramos began to introduce the Raifmans to a series of his favored tax-to-equity strategies, notably the ClassicStar mare leasing program. The ClassicStar program offered individuals an opportunity to enter the thoroughbred horse breeding and racing businesses by enabling them to lease the reproductive capacity of ClassicStar's mares for the duration of a thoroughbred breeding season. During the term of the lease ClassicStar would mate these leased mares, and any resulting foals would become the property of the participating lessee.

Although ClassicStar disclaimed the notion that past results were indicative or a guaranty of future performance, its promotional materials boasted that the sale of any resulting foal typically yielded participants a significant return on their

[*17] investment.  But more important than those returns were the ostensible tax benefits ClassicStar claimed would result from participation in its program.  Notably, ClassicStar promoted its lease fees as a fully deductible farm business expense that could shield current-year income from taxation and, should that deduction exceed the participant's current-year income, could be carried back to recover tax paid for prior years.  ClassicStar noted that this shielding of ordinary income in the current year provided a future tax benefit to participants upon the sale of any resulting foals, as those gains realized would be taxed only at the preferential capital gains rate.  As an alternative, ClassicStar also offered participants the opportunity to perpetually defer tax by way of like-kind exchanges.

ClassicStar participants were given a "Due Diligence" booklet that provided them with guidance for drafting business plans and participation logs and contained a DVD and a set of tax opinions from accounting firm Karren, Hendrix & Associates, P.C. (Karren), and law firm Handler, Thayer & Duggan, LLC (Handler), each explaining the tax benefits of the program.  However, both ClassicStar's marketing materials and the due diligence booklet encouraged all participants to seek independent tax advice with respect to the benefits that might arise from participation in the ClassicStar program.

[*18] Mr. Ramos calculated that if the Raifmans purchased $3.4 million of mare leases, then they could completely offset the entire tax liability arising from Mr. Raifman's option exercise and also recapture approximately $700,000 of income tax they had paid for prior years. Mr. Ramos explained to the Raifmans his belief that the only risk posed, in this respect, was in establishing that the Raifmans' participation in the program constituted a bona fide business venture.[13] Mr. Ramos provided the Raifmans a copy of the due diligence booklet for their review. The Raifmans reviewed these materials and decided to participate in the ClassicStar program.

On November 24, 2003, the Raifmans executed a letter of understanding with ClassicStar. In the weeks that followed they paid ClassicStar $3.4 million to participate in the program.[14] On January 2, 2004, ClassicStar provided the

---

[13]Mr. Ramos received a commission from ClassicStar for placing clients with the program. Mr. Raifman was aware of this fact. Mr. Raifman discussed the possibility of referring potential clients to Mr. Ramos for the purpose of placing them with ClassicStar and splitting any commissions arising therefrom.

[14]From December 15-19, roughly three weeks after signing the letter of understanding formalizing their participation in the ClassicStar program, Mrs. Raifman attended a ClassicStar seminar in St. Croix where the topic of discussion was primarily the tax implications of having a horse breeding business. Mrs. Raifman's contemporaneous notes from these seminars suggest the seminar's predominant topic was how to generate material participation in order to ensure the preservation of a tax deduction for the current year.

(continued...)

[*19] Raifmans with their mare leasing agreements and a breeding schedule, all backdated to reflect execution on December 31, 2003. The Raifmans' leases began retroactive to December 1, 2003, and would expire July 1, 2004, and projected that any resulting foals would be delivered in spring 2005. The Raifmans' leases explicitly warned that the lessees (i.e., the Raifmans) bore all economic risk of loss should their leases fail to result in a foal and that by entering into this leasing agreement the lessees represented that they had evaluated and fully acknowledge the substantial financial risk inherent to participation in the mare leasing program. Before engaging in the program the Raifmans never met, or otherwise discussed the program with, any ClassicStar employee, agent, or other representative, nor did they seek legal or tax counsel with respect to their participation therein.

During the first quarter of 2004 Mr. Ramos urged the Raifmans to secure a personalized tax opinion with respect to their participation in ClassicStar, and the

---

[14](...continued)

Upon her return, the Raifmans assembled their participation log for 2003. It reported that they engaged in 139 hours of activity with respect to their participation in the ClassicStar program. A total of 62 hours was attributed to pre-participation diligence work (e.g., visiting local California farms and reviewing the due diligence booklet). A total of 24 hours was attributed to reading "Blood Horse" magazine. A total of 39 hours was attributed to Mrs. Raifman's attendence at the St. Croix seminar. A total of 14 hours was attributed to the couple's viewing of six online horse breeding presentations on December 30 and 31, 2003.

[*20] Raifmans directed Mr. Ramos to do so. Mr. Ramos did so by contacting Handler, the law firm that had provided the generic tax opinion included in the ClassicStar due diligence binder. On March 24, 2004, Handler provided the Raifmans with a generic tax opinion, nearly identical to the one in the ClassicStar due diligence binder. This tax opinion opened with an engagement letter disclosing to the Raifmans Handler's conflicts of interest, notably that Handler served as general counsel to ClassicStar and that ClassicStar had paid for the production of this "personalized" tax opinion.

By July 2004 only two of the Raifmans' leased mares had become pregnant, and their leasehold on their remaining mares had expired.[15]

In January 2005 representatives of ClassicStar contacted Mr. Raifman to propose a trade: The Raifmans would exchange their claim to the two in utero

---

[15]In November 2004, months after the Raifmans' mare leases had expired, ClassicStar issued the Raifmans a revised schedule of their mare breeding pairs. The revised schedule reduced the number of leases that the Raifmans had purportedly held and revised the identities of the breeding pairs associated with the Raifmans' failed mare leases. The revised schedule also adjusted the lease and breeding costs for the Raifmans' two pregnant mares. The revised schedule did not extend any leasing periods.

The record does not adequately reveal what precipitated this revision. Neither does it explain how this revised schedule might have otherwise altered the Raifmans' rights as lessees as, again, at the time of modification the Raifmans' leases had expired. We observe that this revision occurred, roughly, at the same time the Raifmans finalized and filed their 2003 tax return in November 2004.

[*21] foals, as well as their other expired, unfruitful leases, for the rights to 25 quarter horse pairs to be bred in spring 2005, with resulting foal delivery projected for spring 2006. Additionally, ClassicStar offered to make incentive payments to the Raifmans and provide them an option to "put" all resulting foals to ClassicStar at a guaranteed price of $4,080,000. (We will refer collectively to this transaction as the quarter horse swap.)

Mr. Raifman directed ClassicStar to contact Mr. Ramos, and ClassicStar did so. On January 4, 2005, Mr. Ramos contacted the Raifmans and expressed enthusiasm for the swap and noted that, in order to ensure that the tax advantages of the swap would be honored, the Raifmans ought to keep up their "active" participation.[16]

On January 7, 2005, the Raifmans' executed the quarter horse swap agreement.[17]

### 3. The Ramos Investments

The Raifmans turned over the proceeds from their various Derivium transactions to Mr. Ramos, who they then entrusted with managing that money in

---

[16]The parties considered this a like-kind exchange.

[17]The record indicates, however, that the Raifmans did not provide ClassicStar with this executed agreement until sometime after February 22, 2005.

**[\*22]** a manner sufficient to meet their objectives. The Raifmans were Mr. Ramos' largest clients, and he afforded them the attention such a status deserved, meeting with them regularly to discuss potential investments and to review the performance of their portfolio.

### a. The Secured Lending Fund

Mr. Ramos recommended that the Raifmans invest in the Secured Lending Fund (SLF). SLF was a fund organized by Robert Keys, the CEO of PCG,[18] and Lee Brower, a PCG affiliate. SLF was in the business of making "hard money" or "bridge" loans to real estate developers who had exhausted, or otherwise could not secure, financing from traditional lenders. Through a related company, SLF would vet potential borrowers and the associated underlying property. However, SLF typically eschewed formal appraisals of the underlying property and would instead look only to past appraisals or rely on informal representations made by real estate professionals familiar with the property and the surrounding area.

SLF did not lend directly but instead facilitated its lending operations through a series of limited liability companies (sub-SLFs). Each sub-SLF would

---

[18]By late 2003, although he retained ownership and his position as PCG's CEO, Robert Keys' primary focus was on his personal book of clients and investment opportunities; he had delegated most of the company's day-to-day operations to other PCG executives.

[*23] provide its borrower any requested funding in exchange for a security interest in the borrower's underlying real estate development. Generally, each sub-SLF was funded by selling its debt to third parties (sub-SLF investors). Sub-SLF investors would receive a note promising above-market yields and purporting to make a "collateral assignment" of the sub-SLF's security interest in the underlying real estate development. Notwithstanding the nomenclature, this collateral assignment did not convey, nor entitle sub-SLF investors to receipt of or the right to record, any security instrument; the collateral assignment did not purport to convey to any sub-SLF investors a deed of trust, mortgage, or any other recognizable security interest. Instead, the intended function of this purported collateral assignment was to establish that each loan made by a sub-SLF was itself secured and to represent to sub-SLF investors that, if necessary, the sub-SLF could foreclose on and sell the underlying real estate development in order to repay its investors.

Mr. Ramos erroneously believed this meant that each note holder's investment was a "secured" interest in the underlying real estate development. Mr. Ramos represented his erroneous belief when selling Mr. Raifman on investing with SLF. Mr. Ramos presented Mr. Raifman with the private

[*24] placement memorandum (PPM) describing the SLF operation.[19]  The

Raifmans invested approximately $1.5 million in sub-SLF notes, which they left

under the management of Mr. Ramos.[20]

---

[19]The SLF PPM described the purported "collateral assignment" as security for the sub-SLF notes, as follows:

> Although the Notes will be limited recourse obligations of * * * [SLF, and each sub-SLF], each Note will also be secured by one or more collateral assignments made by * * * [SLF and each sub-SLF]. Each collateral assignment will assign to * * * [investors] on a pari passu and pro rated basis, all of the collateral that * * * [SLF and each sub-SLF] receive[] from * * * [their borrowers].

Each sub-SLF borrower

> will pledge real estate in addition to other acceptable collateral to secure Bridge Loans made by * * * [SLF and each sub-SLF]. * * * [SLF and each sub-SLF] will collaterally assign all of the collateral that * * * [SLF and each sub-SLF] receive[] from * * * [their borrowers].

The PPM, with respect to the purpose and intent of the collateral assignment, is equally abstruse, providing that the collateral assignment "is intended to make * * * [investors] secured creditors of * * * [SLF and each sub-SLF] in the unlikely event of a * * * [SLF or sub-SLF] bankruptcy."

[20]Mr. Ramos established the Real Return Fund in late 2005 as a limited partnership. Generally, Mr. Ramos would request that his clients contribute those assets under his management into the fund because this would benefit all his clients as the collectivization of risk reduced the exposure of each individual client. Upon contribution, each of his clients would become a partner in the partnership. The Raifmans agreed to this collectivization of risk and put approximately $2.16 million of their Ramos-managed investments and other assets

(continued...)

[*25] Ultimately, because of the high-risk nature of the loans made and a downturn in the real estate market, the sub-SLFs were forced to foreclose on almost all of the real estate developments to which they had extended loans. These foreclosures, however, were often mired in dispute and rarely resulted in investor repayment.

b.    A Stroke of Genius:  Prints and Advertising Debt

Mr. Ramos also presented the Raifmans with an opportunity to invest in debt issued for the print and advertising campaign (P&A) of a feature-length motion picture, Bobby Jones:  A Stroke of Genius.  Although he lacked any familiarity with motion picture financing and understood that this debt was unsecured and risky, Mr. Ramos felt this investment was a "can't miss" opportunity as the debt carried a 12% interest rate and featured a back-end "sweetener" that promised P&A investors an equity stake in the film should it succeed at the box office.[21]  Mr. Ramos informed the Raifmans that both he and Mr. Glaser had personally invested in the P&A debt.  Mr. Ramos provided Mr.

---

[20](...continued)
into the Real Return Fund.  For convenience, we distinguish between SLF investments and the Real Return Fund only where necessary.

[21]Ideally, Mr. Ramos noted, the film only needed to gross $10 million in order to ensure that investors received the desired results.

**[\*26]** Raifman with the private placement offering materials for the P&A debt. In March 2004 the Raifmans agreed to purchase $400,000 of notes issued by P&A.

The film underperformed at the box office. On January 6, 2006, Mr. Ramos wrote to his clients to inform them that he considered the P&A debt worthless and to acknowledge errors in his judgment. Accordingly, Mr. Ramos refunded to his clients all management fees he had collected with respect to the P&A debt and recommended that his clients write off their entire investment.

## II. The Raifmans' 2003 Return and Subsequent Audit

### A. Shopping for an Adviser

In early 2004 the Raifmans directed Mr. Ramos to meet with Tim Jorstad, their longtime C.P.A., to discuss the tax effects of their participation in the ClassicStar program. Following that meeting the Raifmans informed Mr. Ramos that they had dismissed Mr. Jorstad, and they requested that Mr. Ramos refer them to another C.P.A to begin preparing their 2003 tax return. Mr. Ramos referred the Raifmans to, and the Raifmans subsequently engaged, Don Shaw, a licensed C.P.A. and the father-in-law of one of Mr. Ramos' employees.[22]

---

[22]The Raifmans hired Mr. Shaw approximately four months after they had engaged in the ClassicStar program. Mr. Shaw's contract with the Raifmans specifically limits the scope of his duties and responsibilities as their return preparer.

[*27] Following a conversation with Mr. Ramos and agents of ClassicStar,[23] Mr. Shaw accepted the representation that the Raifmans were engaged in a bona fide horse breeding trade or business, despite lacking any particular belief that the Raifmans had any business purpose for participating in the ClassicStar program beyond capturing the program's tax benefits. Accordingly, Mr. Shaw reported the Raifmans ClassicStar buy-in as a deductible $3.4 million agribusiness expense for tax year 2003.

Relying on Mr. Ramos' representation that the Derivium transactions constituted bona fide loans, Mr. Shaw did not report as income any of the proceeds received therefrom, and for the same reason he did not review any of the related contracts or other relevant materials. Mr. Shaw proceeded in a similar fashion with respect to deducting Derivium interest expenses on the Raifmans' tax returns for the years at issue.

On November 16, 2004, Mr. Shaw completed the Raifmans' return for tax year 2003, and Mr. Ramos informed the Raifmans that they should expect a prompt Federal income tax refund of half a million dollars.

---

[23]Mr. Shaw testified that he principally and directly dealt with Mr. Ramos-- "probably 90 percent" of the time--with respect to any matters related to the Raifmans' returns.

**[\*28]** Mr. Shaw remained the Raifmans' return preparer through tax year 2014. Mr. Shaw used the same approach to coordinating and completing those returns as he had with the 2003 return.

B.  Auditing the Raifmans' 2003 Tax Return

In 2005 the Internal Revenue Service (IRS) began an examination of the Raifmans' tax return for 2003. The IRS initially selected the Raifmans' return for examination because Mr. Shaw failed to report any tax consequence associated with the exercise of Mr. Raifman's nonqualified Valueclick options; once the examination began, however, the IRS soon expanded its scope to include review of the Raifmans' participation in the Derivium and ClassicStar programs.

Mr. Shaw initially represented the Raifmans during this examination and closely coordinated his representation with Mr. Ramos. As the examination progressed, Mr. Shaw and Mr. Ramos became increasingly concerned with preserving the treatment of the Raifmans' participation in the ClassicStar program and their associated multiyear refund claim. Accordingly, Mr. Shaw began to coordinate directly with ClassicStar representatives. Specifically, as the examination continued, the IRS began to question Mr. Shaw with respect to the Raifmans' quarter horse swap. Earlier, ClassicStar had directed Mr. Shaw to refrain from providing the auditor any documentation or information with respect

[*29] to the quarter horse swap, in the hope of preserving its treatment as a like-kind exchange. Sensing that the auditor's interest in this issue could further complicate the examination, Mr. Shaw contacted ClassicStar to develop a coordinated response to the IRS' now-expanding inquiry. The ClassicStar solution, however, led to Mr. Shaw's routinely presenting the IRS examiner with fabricated and otherwise uncorroborated reports with respect to the Raifmans' purported horse breeding business.

Subsequently, at the recommendation and, initially,[24] the expense of ClassicStar, the Raifmans engaged a law firm to represent them before the IRS examiner. The examination of the Raifmans' 2003 tax return closed when the Raifmans entered into a closing agreement[25] wherein they conceded liability for a $1,025,640 deficiency in tax and agreed that their participation in the ClassicStar program was a nondeductible expense.

The examination of their returns for the years at issue, continued, however. On November 21, 2013, respondent issued a notice of deficiency determining the

---

[24]ClassicStar ceased to pay for the Raifmans' legal representation sometime in mid-August 2006. At that time the Raifmans independently retained the same firm to continue to represent them before the IRS.

[25]The Raifmans' failure to pay the tax assessed pursuant to this closing agreement gave rise to their associated CDP case, discussed supra note 2.

[*30] Raifmans had income tax deficiencies for the years at issue. The deficiencies reflected, as relevant here, respondent's disallowance of interest expense deductions related to Derivium transactions for tax years 2004-06, deductions for additional ClassicStar expenses for tax year 2004, a theft loss deduction exceeding $15 million for tax year 2008, and a determination that the Raifmans had underreported their capital gain income for tax year 2004 from their participation in the Derivium program.

III. Collapse and Aftermath

A. Derivium

As the examination of the Raifmans' 2003 return continued, their first Derivium transaction neared "maturity". Derivium contacted the Raifmans to notify them of this approaching maturity date and to remind them of their possible alternatives to repayment. At that time, September 2006, Valueclick had appreciated significantly, to the extent that the Raifmans realized that the value of the shares they had originally transferred now exceeded the "principal" and "interest" due on their "loan". Accordingly, the Raifmans directed Mr. Ramos to pursue their available alternatives to payment, specifically to request that Derivium return to them an amount of Valueclick shares equivalent to the excess of appreciation of the "collateralized" Valueclick stock over their balance due.

**[\*31]** Derivium, however, failed to honor this request. Derivium also failed to honor the Raifmans' secondary request: to extend the term of the agreement, to "refinance" in exchange for cash proceeds equal to the as-yet uncaptured appreciation of the "collateralized" Valueclick stock. The Derivium-related entities were regularly collapsing or dissolving.[26]

On March 5, 2010, Mr. Cathcart, the principal of the Derivium program, was permanently enjoined from promoting it, as it constituted an abusive tax shelter.

Following the complete collapse of Derivium and all associated entities, the Raifmans, joined by a number of other former Derivium participants, attempted to sue Wachovia for its role in facilitating the transfer of participants' shares to Derivium. On March 31, 2014, the U.S. District Court for the Northern District of California dismissed the participants' claims. In May of 2016, the Court of Appeals for the Ninth Circuit affirmed the judgment of the District Court.

---

[26]A year earlier, in September 2005, Derivium had filed a voluntary petition for chapter 11 bankruptcy protection. On October 10, 2005, Noel Murphy, Don Shaw's son-in-law, brought to Mr. Ramos' attention a Forbes article detailing the collapse-in-progress of Derivium and its related entities.

[*32] B.    ClassicStar

In February 2006 Government agents raided the offices of ClassicStar on the suspicion that ClassicStar was in the business of operating abusive tax shelters.[27]

Meanwhile, the IRS examination of the Raifmans' participation in the ClassicStar program was expanding. Mr. Raifman began pressing Mr. Ramos to pursue the incentive payments promised in the quarter horse swap and to further pressure ClassicStar to provide the Raifmans a refund of their original $3.4 million participation fee. On June 20, 2006, ClassicStar wired the Raifmans $70,000 as part of the incentives payments arising from the quarter horse swap. Aware that the Raifmans' IRS examiner was beginning to expand her inquiry to include review of the quarter horse swap, Mr. Ramos also began demanding that ClassicStar provide documentation, specifically proof of birth and registration, with respect to the horses associated with the swap. ClassicStar failed to produce

_____

[27]The record suggests that the Raifmans discovered that ClassicStar was under investigation only when they were contacted by the Department of Justice (DOJ) in August of 2006. Pursuant to that initial contact, the Raifmans were offered immunity from prosecution for any Federal crime, on the basis of statements they provided pursuant to an immunity agreement, including but not limited to violations of secs. 7201 and 7206, criminal tax evasion, and criminal false statements to the taxing authorities, respectively.

The Raifmans accepted these offers of immunity roughly a year later, in September 2007.

[*33] this information. ClassicStar and its attorneys did, however, continue to work with both Mr. Ramos and the Raifmans to arrive at an acceptable settlement to compensate the Raifmans for ClassicStar's failures.

A number of the principals of the ClassicStar program were indicted for, and pleaded guilty to, conspiracy to defraud the U.S. Government through their operation and promotion of the ClassicStar program.

In a related civil lawsuit, the Raifmans and numerous other ClassicStar participants were collectively awarded damages in excess of $50 million, resulting from ClassicStar's fraud. See West Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease Litig.), 727 F.3d 473 (6th Cir. 2013). Pursuant to that disposition the Raifmans, between 2008 and 2012, settled a number of associated claims against other parties who had directly facilitated or aided in the ClassicStar program's fraud, receiving settlements of $50,000 from Handler in 2008, $20,754 from Karen Hendrix in 2009, and $918,975, collectively, from GasStar, ClassicStar's parent company, and associated individuals.

C.    Mr. Ramos and Mr. Keys

As the examination of their returns continued into July 2007, the Raifmans dismissed Mr. Ramos, generally, from his investment advisory duties. However, they did not completely remove their assets from his management, believing there

**[*34]** was still value in allowing their investments in SLF to mature; accordingly, they retained Mr. Ramos to continue managing such until 2008, when Mr. Ramos resigned. At the time of his resignation Mr. Ramos informed the Raifmans that it might take as long as five years to unwind and liquidate their remaining investments because of issues with particular assets, but most notably because of tax concerns arising from the Raifmans' offshore investment vehicles.

In September 2007 the Raifmans entered arbitration with Mr. Ramos, PCG and Mr. Keys, alleging, among other things, numerous breaches of fiduciary duty, including self-dealing and nondisclosure; breach of contract; negligence; fraud; and misrepresentation. After 18 days of hearings, the arbitrator determined that Mr. Ramos had failed to adequately disclose referral fees and commissions he had received from the operators and promoters of many of the investments and programs that he had sold the Raifmans and the fee sharing aspects of his relationship with PCG. The arbitrator also determined that Robert Keys, in his role as CEO of PCG, had a conflict of interest in that he encouraged PCG and its affiliates to promote investment vehicles he had founded or which would result in the largest commissions to him personally.[28]

---

[28]The arbitrator also laid out the deficiencies in Mr. Ramos' comprehension of the nature of the SLF notes in which he had encouraged the Raifmans to invest,

(continued...)

[*35] Accordingly, on September 23, 2009, the arbitrator ruled that Mr. Ramos and PCG were liable for, among other things, breaching their fiduciary duties to the Raifmans. The arbitrator did not, however, hold that Mr. Ramos and Mr. Keys had committed common law fraud. Instead, owing to their breaches of duty and care, the arbitrator held that they were liable for having worked a constructive fraud on the Raifmans, as the arbitrator specifically found that neither Mr. Keys nor Mr. Ramos acted with any intent to deceive or defraud the Raifmans. Accordingly, the arbitrator generally awarded the Raifmans damages arising from, among other things, their participation in the ClassicStar ($5 million) and Derivium ($7,500,000) programs and their investments in the P&A and SLF notes ($500,000 and $2,500,000, respectively). Mr. Ramos, Ramos Financial, Mr. Keys, and PCG were held jointly and severally liable for those damages.

Shortly after the arbitrator delivered his decision, Mr. Ramos filed for bankrupcy protection. The Raifmans intervened and secured a settlement agreement with Mr. Ramos, wherein he promised to pay them $900,000 pursuant

---

[28](...continued)
and the deficiencies in SLF's borrower vetting and loan issuance procedures. At the time of the arbitration proceedings SLF had begun to foreclose on nearly all of the properties for which it had extended loans. The record at arbitration revealed that SLF had regularly failed to adequately evaluate the properties itself and had insufficient capital to ensure it could adequately seize the troubled properties.

[*36] to the arbitration and agreed to testify on their behalf in any further actions brought against Mr. Keys or in any further proceedings with the taxing authorities.

On November 19, 2009, the Raifmans filed a suit in the Superior Court of California, County of San Francisco, naming as defendants, among others, Mr. Keys, SLF, and related sub-SLF entities. The Raifmans alleged the defendants had, among other things, perpetrated securities fraud and actual fraud. The Raifmans moved to voluntarily dismiss this action on December 17, 2010.

On May 11, 2010, Mr. Keys filed for chapter 7 bankruptcy protection. Mr. Keys subsequently pleaded guilty to wire fraud and money laundering offenses with respect to a $1.1 million loan he brokered between a longtime client and a recent business associate, and bankruptcy fraud.

OPINION

I.    The Theft Losses

    A.    The Nature of the Parties' Contentions

The Raifmans do not dispute respondent's determinations as set forth in the notice of deficiency with respect to their participation in the Derivium and ClassicStar programs. Instead, they argue that the facts and circumstances surrounding their participation in those programs, as well as their investment in

**[*37]** the SLF notes, ought to entitle them to deduct theft losses for tax year 2008.[29] The Raifmans argue a unique theory with respect to each loss. These theories are as follows.

With respect to their Derivium transactions, the Raifmans argue that each transaction was two separate transactions: the sale of their stock to Derivium, and their purchase of an "option" to reacquire from Derivium an identical amount of stock at maturity for a strike price equal to their balance due.[30] In this respect, the Raifmans allege that Derivium's failure to honor these "options" at the maturity of their first agreement, and Derivium's subsequent collapse before the maturity of their second and third agreements, constitute the theft of those options by false pretenses. The Raifmans appear to specifically allege that they were intentionally defrauded by Derivium's principal, Mr. Cathcart.

---

[29]Although in their original 2008 return the Raifmans claimed a $15,160,607 theft loss, they now appear to claim only a $10,798,061 theft loss. This loss comprises individual losses of $2,475,000 related to their participation in the ClassicStar program, $3,750,000 related to their direct transactions with the Derivium program, $2,638,977 related to their Derivium transaction routed through Helicon, and $1,934,084 with respect to their investments in SLF notes and as associated with the Real Return Fund.

[30]The Raifmans' argument appears to rely on Calloway v. Commissioner, 135 T.C. 26 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012). There, this Court characterized the alternatives to payment as being "at best" an "option" to purchase from Derivium an equivalent amount of stock for a price equal to the principal and accrued interest on the purported loan. Id. at 35-37.

[*38] With respect to ClassicStar, noting that respondent has conceded that an actual theft occurred, the Raifmans allege that the ClassicStar program constituted a "ponzi" scheme and seek to avail themselves of the safe harbor provisions provided by Rev. Proc. 2009-20, 2009-14 I.R.B. 749.

With respect to their investments in SLF notes, the Raifmans allege that Mr. Keys and other principals of SLF defrauded them by misrepresenting the nature of their investment in SLF, notably that the notes did not convey to the Raifmans any security interest in any underlying properties.[31]

With respect to Derivium and SLF, respondent alleges that the Raifmans failed to establish that an actual theft occurred, notably because the Raifmans have failed to establish the criminal intent of Mr. Cathcart or Mr. Keys. With respect to their participation in the ClassicStar program, respondent argues that the Raifmans have failed to establish the appropriate amount of their theft loss and the appropriate year of its deduction. Respondent additionally contends that the Raifmans are ineligible for safe-harbor treatment under Rev. Proc. 2009-20, supra,

---

[31]The Raifmans do not allege privity with Mr. Keys or any other agent or principal of SLF; rather they allege that the misrepresentations made by those individuals to Mr. Ramos and subsequently communicated to the Raifmans by Mr. Ramos, resulted in a theft by false pretenses.

**[\*39]** because they do not constitute "qualified investors" and the ClassicStar program does not constitute a "specified fraudulent arrangement", as defined.

B.    Theft Loss Analysis

Section 165 generally permits taxpayers to deduct against their ordinary income the amount of any uncompensated loss resulting from theft for the year in which the taxpayer sustains that loss.  See sec. 165(a), (c), (e).  To qualify for a theft loss deduction, taxpayers must prove:  (1) the occurrence of a theft, (2) the amount of the theft loss, and (3) the year in which the taxpayers discover the theft loss.  Id.  The taxpayer bears the burden of proving entitlement to a theft loss deduction.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In order to ascertain whether theft has occurred, this Court applies the law of the State where the loss was sustained.  Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), aff'g 61 T.C. 354 (1973).  Because the alleged theft took place in California, we apply California law.  Under California Penal Code section 484, any person who shall "feloniously steal, take, carry, lead, or drive away the personal property of another, \* \* \* or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money \* \* \* or real or personal property" will be held accountable for theft.  Cal. Penal Code sec. 484(a) (Deering 2000).  While this statute endeavors to consolidate all

[*40] theft offenses within its terms, the State of California still recognizes that the individual elements of each permutation of theft--such as larceny, false pretenses, embezzlement--have remained unchanged. People v. Gonzales, 392 P.3d 437, 441-445 (Cal. 2017); People v. Ashley, 267 P.2d 271, 279 (Cal. 1954).

Insofar as the Raifmans allege theft through fraudulent misrepresentations, they allege theft by false pretenses. Theft by false pretenses consists of three conjunctive elements: (1) the perpetrator must, knowingly and with the specific intent to defraud the property owner, (2) have made a false representation or pretense which (3) materially influenced the owner to part with his or her property in reliance on those representations. People v. Williams, 305 P.3d 1241, 1248 (Cal. 2013). Implicit in these elements is a relationship of privity between the perpetrator and his or her victim. Crowell v. Commissioner, T.C. Memo. 1986-314.[32]

_____

[32]In certain narrow circumstances a theft loss deduction has been allowed where the taxpayer lacks privity with the alleged thief. See Boothe v. Commissioner, 768 F.2d 1140 (9th Cir. 1985), rev'g 82 T.C. 804 (1984). The Raifmans do not allege privity with Mr. Cathcart, Mr. Keys, or any other agent or principal of Derivium or SLF. Instead, the Raifmans argue that our analysis ought to look beyond privity and to apply a "feeder" theory to our theft loss analysis, as suggested in Paine v. Commissioner, 63 T.C. 736 (1975), aff'd without published opinion, 523 F.2d 1053 (5th Cir. 1975), and Jensen v. Commissioner, T.C. Memo. 1993-393, aff'd without published opinion, 72 F.3d 135 (9th Cir. 1995). As we reach our holding on the question of intent, however, we need not and do not

(continued...)

**[*41]** Intent to defraud is a question of fact to be determined from all the circumstances of the case and usually must be proven circumstantially. People v. Fujita, 117 Cal. Rptr. 757, 765-766 (Ct. App. 1974). Courts must examine the evidence to determine whether an alleged thief behaved in a manner consonant with an intent to defraud; a record establishing a mere ordinary breach of contract or fiduciary duty will be insufficient to support a finding of a party's intent to defraud. See Ashley, 267 P.2d at 265.

C.    Derivium

The Raifmans argue they are entitled to a theft loss deduction arising from their participation in the Derivium program. As the Raifmans see it, the alleged theft relates to Derivium's failure to honor the "options" arising from the agreements' alternatives to payment. To establish the requisite criminal intent with respect to this theft claim, the Raifmans rely nearly exclusively on a permanent injunction enjoining Mr. Cathcart, the Derivium principal, from continuing to promote and operate that program. The District Court for the Northern District of California entered this permanent injunction against Mr. Cathcart pursuant to section 7408.

---

[32](...continued)
address the Raifmans' "feeder" theory or otherwise analyze any issue pertaining to matters of privity.

[*42] Section 7408 authorizes the Federal District Courts to enjoin individuals who have engaged, as relevant here, in the promotion of abusive tax shelters when it is shown that an individual organized or sold, or participated in the organization or sale of, an arrangement, and made or caused to be made false statements concerning the tax benefits to be derived from that arrangement while knowing, or having reason to know, the falsity and materiality of those false statements. See, e.g., United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000).

We do not find this injunction, and the associated materials, to be dispositive with respect to the Raifmans' theft claim. While the injunction may be highly probative with respect to Mr. Cathcart's intent to develop and market an abusive tax shelter, it does not follow that Mr. Cathcart conceived and implemented the program "options", the alternatives to payment, with the specific intent to defraud the Raifmans, or any other participant of his tax shelter, of their property.[33]

---

[33]The Government was granted summary judgment with respect to the falsity of the Derivium program's purported tax benefits. Trial was to be held in order to resolve, primarily, the disputed factual question of whether Mr. Cathcart knowingly misrepresented those tax benefits. At trial he declined to contest this remaining factual allegation. Accordingly, he was enjoined from promoting the Derivium program or any other program similar thereto.

**[*43]** Rather the injunction gives rise to a strong inference that Mr. Cathcart's intent was to develop and market a tax shelter that might disguise sales as a lending arrangement.[34] In order to ensure that the sales would be honored as the nonrecourse loans they purported to be, the transaction necessitated pro forma documentation that would suggest the existence of bona fide indebtedness. Accordingly, Mr. Cathcart developed the "loan" agreements, specifically the alternatives to payment at issue here, in a manner that he believed would provide his program the veneer necessary to help it survive scrutiny and deliver his clients the tax benefits he promised. The agreement and its terms, the alternatives to payment, were part and parcel of the Derivium transaction's nature as a disguised sale.

To the extent we find the injunction and the other Derivium-related materials indicative of any intent, we find only that Mr. Cathcart intended to market a tax shelter and to aid and abet in the defrauding of the U.S. Treasury. On the record before us, we do not find evidence sufficient to establish that he intended to defraud any individual Derivium participant through a failure to

---

[34]The contracts clearly indicated to the participants that in turning over their property to Derivium, they were transferring thereto all the benefits and burdens of, and complete dominion over, the stock. The loan was nonrecourse to the participant and could not be called before maturity. Similarly, the participants were prohibited from prepaying any interest or principal.

**[\*44]** perform on the program's ill-conceived "options", the alternatives to payment. Accordingly, the Raifmans have failed to establish the requisite intent necessary to sustain their Derivium-related theft claim.[35]

### D.     Secured Lending Fund

The Raifmans argue they are entitled to a theft loss deduction arising from their investment in SLF. The Raifmans allege that Mr. Keys misrepresented, and caused others to intentionally misrepresent, the nature of the "collateral assignment" integral to the sub-SLF notes and that Mr. Keys did so with the intent of depriving investors of their money. To establish the requisite intent of Mr. Keys, the Raifmans rely on the testimony of Mr. Ramos and an expert report.

Mr. Ramos repeatedly testified that Mr. Keys lied to him with respect to the nature of SLF and the associated collateral assignment. The weight of the entire record, however, establishes that Mr. Keys had little contact with Mr. Ramos and

---

[35]The Raifmans have entered into the record an expert report purporting to provide a valuation of these theoretical "options", to establish the fair market value thereof. Additionally, the Raifmans argue that they are entitled to a step-up in basis because the Derivium transaction did not constitute a literal sale but rather a "constructive sale" under sec. 1058. Because we decide the issue of theft on the existence of intent, we decline to explore these aspects of the Raifmans' claim. We observe, however, that respondent's initial determination with respect to the proper tax treatment of the Derivium transaction appears to have already accounted for the 10% of the market value of their ValueClick stock which was not monetized in the Derivium sale. See Calloway v. Commissioner, 135 T.C. at 53 (Halpern, J., concurring).

[*45] does not establish that, in their limited communications, Mr. Keys ever willfully communicated any material misrepresentation with respect to SLF and its purported collateral assignment with an intent to defraud Mr. Ramos or his clients.[36] We observe that the PPM details the nature and operation of the collateral assignment and that the terms it employs in doing so are arguably ambiguous. The record before us does not, however, establish that Mr. Ramos, Mr. Keys, or any other individuals associated with SLF were at odds with respect to how they interpreted the term "collateral assignment" and how such a collateral assignment was to operate. The record establishes that the principals of SLF understood that they were obligated to "collaterally assign" any "collateral received" from their borrowers to SLF investors. The principals of SLF understood this to mean that SLF investors would be entitled to repayment of their "limited recourse" notes from the proceeds of foreclosure. The record similarly establishes that Mr. Ramos, having read the PPM and done the due diligence required of him, arrived at a similar understanding. That Mr. Ramos and others then began describing the notes issued by SLF as "secured" appears to belie their

_____

[36]As respondent notes, in California the misrepresentation or omission of a material fact in the offering or selling of a security may be unlawful. Cal. Corp. Code sec. 25401 (Deering 2014). Such a misrepresentation, however, will be considered criminal only when it is made wilfully (i.e., intentionally). Id. sec. 25540(b); People v. Salas, 127 P.3d 40, 49 (Cal. 2006).

[*46] comprehension as to the actual meaning, function and operation of a security interest. But it certainly does not give rise to an inference of willful misrepresentation with the intent to defraud investors. Accordingly, we find that the testimony of Mr. Ramos lacked credibility and reliability and failed to establish that Mr. Keys, or any other SLF principal, exhibited the intent necessary to sustain the Raifmans' allegations of theft.[37]

The expert report offered by the Raifmans re-interprets the factual findings and holdings of the Raifmans' arbitration with Mr. Ramos and Mr. Keys in order to arrive at the determination that the actions of Mr. Keys were "categorically fraudulent" and that the "entirety of the Raifman's [sic] experience" with Mr. Keys, and associated entities, was based on fraud. The report purports to arrive at this conclusion through an application of the industry standards of care for investment advisers.

To the extent the expert report is meant to support a conclusion that Mr. Keys defrauded the Raifmans, it is unhelpful. The report does not invite our attention to any particular indicia of the willful intent of Mr. Keys to defraud the

---

[37]We observe that the Raifmans have entered into the record numerous documents related to guilty pleas entered by Mr. Keys with respect to unrelated crimes. To the extent the Raifmans invite us to infer, by way of propensity evidence, that Mr. Keys intended to defraud them, we decline to do so.

**[*47]** Raifmans, or any other SLF investor.  Moreover, the report primarily summarizes the arbitration opinion and, in doing so, appears to conflate breaches of fiduciary duties and industry standards of care with the relevant California law germane to our analysis under section 165.[38]  We recognize that fraud may take many forms, but the defects and redundancy of this report lead us to accord it very little weight with respect to establishing that Mr. Keys, or any other party related to the SLF investments, acted with an intent to defraud the Raifmans.

    E.    ClassicStar

        1.    Concession, Positions, and the Remaining Elements

In a response to a motion for summary judgment filed by the Raifmans, respondent conceded that the Raifmans suffered a theft pursuant to their participation in the ClassicStar program.  Recognizing respondent's concession, our analysis turns to the remaining two elements of a theft loss:  (1) the correct year of a deduction and (2) the correct amount of the deduction.

The Raifmans, however, argue that the ClassicStar program constituted a ponzi scheme and rely exclusively on Rev. Proc. 2009-20, supra, in inviting this Court to hold the same in accordance with Rev. Rul. 2009-9, 2009-14 I.R.B. 735.

---

[38]This is, perhaps, to prevent the report from appearing to offer an impermissible legal conclusion.  See Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1058 (9th Cir. 2008).

**[*48]** Accordingly, the Raifmans argue that they are entitled to a theft loss deduction of $2,475,000.[39] The Raifmans do not, however, allege a specific context for the theft here conceded, and they do not identify the nature of the property stolen. Similarly, they do not attempt to establish the fair market value of, or their basis in, the unidentified stolen property.

### 2. The Provisions of Rev. Proc. 2009-20

The Raifmans allege the ClassicStar program constituted a ponzi scheme and ask this Court to apply Rev. Proc. 2009-20, supra, to afford them a theft loss deduction in accordance with the Commissioner's disposition in that revenue procedure. We observe that revenue procedures and revenue rulings are not necessarily binding on this Court, see Estate of Lang v. Commissioner, 613 F.2d 770 (9th Cir. 1980), aff'g in part, rev'g in part 64 T.C. 404, 406-407 (1975), and note that to the extent this Court might apply this revenue procedure, we would not hold that the Raifmans qualify for beneficial treatment thereunder.

As pertinent here, Rev. Proc. 2009-20, supra, provides a safe harbor for a taxpayer who is a "qualified investor" that unwittingly experienced losses by way of participation in certain specified fraudulent arrangements. This procedure

---

[39]This amount appears to represent the Raifmans' initial ClassicStar participation fee, reduced in acknowledgment of their receipt of various incentive and settlement payments.

**[\*49]** generally relaxes the showing required of a taxpayer with respect to the timing and amount of a theft loss.  When a taxpayer qualifies for the safe harbor treatment, the Commissioner will not challenge that taxpayer's theft loss deduction of the full amount of the taxpayer's investment, for the tax year in which the theft was "discovered".

A qualified investor is a taxpayer who did not have actual knowledge of the fraudulent nature of the arrangement before its becoming known to the general public; additionally, the arrangement must not constitute a tax shelter, as defined in section 6662(d)(2)(C)(ii).  As relevant here, section 6662(d)(2)(C)(ii) defines a tax shelter as any investment plan or other arrangement whose significant purpose is the avoidance or evasion of Federal income tax.  An investment plan or other arrangement will be considered principally, significantly, motivated to avoid taxation if that purpose exceeds any other purpose.  Sec. 1.6662-4(g)(2), Income Tax Regs.  The existence of an economic motivator will not, itself, establish that a transaction's principal purpose is not the sheltering of income from taxation if objective evidence indicates otherwise.  Id.

Mr. Ramos introduced the Raifmans to the ClassicStar program principally because Mr. Ramos believed it could offset the Raifmans' "phantom" tax liability arising from their exercise of Mr. Raifman's nonqualified Valueclick options.  Mr.

[*50] Ramos determined, with exactitude, the amount of money that the Raifmans' would need to buy into the ClassicStar program in order to offset that liability, and provide them a net operating loss large enough to secure a refund of their Federal income tax paid for prior years.[40]  Moreover, the record is replete with depositions and testimony wherein Mr. Ramos, Mr. Shaw, and Mrs. Raifman stated that the Raifmans' principal purpose for participating in the ClassicStar program was to avoid income tax for 2003 and recover income tax paid for previous years.

The weight of the evidence before us fails to establish that the Raifmans participated in the ClassicStar program for any significant purpose other than the avoidance of Federal income tax.  We find that the Raifmans do not constitute qualified investors and, accordingly, they could not qualify for the safe harbor provisions of Rev. Proc. 2009-20, supra.

### 3. The Amount of the ClassicStar Theft Losses

The amount of a theft loss is limited to the lesser of (1) the fair market value of the property immediately before the theft or (2) the adjusted basis of the stolen

---

[40]We also observe that, in this manner, the ClassicStar program was designed to operate as an "artful device" that enabled its participants to shelter ordinary income from taxation for a current year and to convert ordinary income into capital gain income a short time later.  See, e.g., Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 265 (1958) (citing Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 52 (1955)).

[*51] property.  Sec. 165(b); secs. 1.165-7(b)(1), 1.165-8(c), Income Tax Regs.  A taxpayer may not, however, deduct a theft loss to the extent he or she has recovered or been compensated for that loss.  Sec. 165(a); see Doud v. Commissioner, T.C. Memo. 1982-158.

To the extent established by the record before us, we find that the Raifmans were victims of a theft arising exclusively in the context of the material misrepresentations made by ClassicStar to induce their acceptance of the quarter horse swap agreement.  Similarly, we find that the property the Raifmans conveyed in reliance on those misrepresentations was their interests in the two unborn foals and any rights arising from their unfruitful mare leases that had previously expired on July 1, 2004.  The record establishes bases[41] for these two in utero foals of $281,865 and $480,700.

---

[41]With respect to the amount of their theft loss the Raifmans relied exclusively on Rev. Proc. 2009-20, 2009-14 I.R.B. 749, as discussed above. Accordingly, they declined to offer any data or calculations indicative of the fair market value of the rights arising from their expired leases, did not invite our attention to any data or calculation with respect to any collateral expenses incurred pursuant to their attempts to recover their property, and have advanced no associated argument with respect thereto.  See Ander v. Commissioner, 47 T.C. 592, 595 (1967)

**[*52]**      4.      <u>The Year of Loss</u>

Generally, taxpayers may deduct a loss only for the year such loss is sustained. Sec. 165(a). With respect to theft losses, however, taxpayers are permitted to treat the theft loss as being sustained during the taxable year in which the taxpayer discovers the theft. Sec. 165(e). Taxpayers may not, however, claim a theft loss deduction for a year in which he or she may still have a claim for reimbursement, with respect to which there is a reasonable prospect of recovery. Sec. 1.165-1(d)(2) and (3), Income Tax Regs. A reasonable prospect of recovery will postpone the theft loss deduction until such time as that prospect no longer exists. Sec. 1.165-1(d)(3), Income Tax Regs.

The Raifmans, among other investors, concluded litigation against ClassicStar and its parent corporations in 2013 and have been routinely recovering from related parties since initiating litigation with ClassicStar in 2008. Accordingly, we reject the Raifmans' claim that 2008 is the proper year for them to recognize their theft loss associated with their participation in the ClassicStar program.

II.      <u>The Investment in P&A Notes as a Worthless Security Capital Loss</u>

The Raifmans argue that they ought to be allowed to deduct a long-term capital loss for tax year 2008 with respect to their investment in the P&A notes. If

[*53] a security which is a capital asset becomes worthless during the taxable year, section 165(g) allows a taxpayer to deduct the loss resulting therefrom as a capital loss. A security, for these purposes, constitutes a bond, a note, or other evidence of indebtedness, issued by a corporation. Sec. 165(g)(2). Individuals may deduct capital losses to the extent of capital gains plus $3,000 of ordinary income. Sec. 1211(b).

A taxpayer seeking a deduction for a worthless security must, among other things, prove the actual worthlessness of the security. A taxpayer may claim such a deduction only for the first year in which there is no reasonable chance of recovery. Sec. 1.165-4(a), Income Tax Regs.; see Vincentini v. Commissioner, T.C. Memo. 2008-271, slip op. at 17-19, aff'd, 429 F. App'x 560 (6th Cir. 2011); Favia v. Commissioner, T.C. Memo. 2002-154. If, in the year of discovery, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss for which reimbursement may be received may be deducted until the taxable year in which it can be ascertained with reasonable certainty whether or not the reimbursement will be received, for example, by a settlement, adjudication, or abandonment of the claim. Secs. 1.165-1(d), 1.165-5, 1.165-8(a)(2), Income Tax Regs. As with theft losses,

**[\*54]** taxpayers may deduct a worthless security loss only to the extent not compensated. Sec. 165(a).

The record establishes that the Raifmans invested $400,000 in the P&A notes. These notes are a security within the meaning of section 165(g). The money owed the Raifmans on those notes is unlikely to ever be paid. In September 2009 the Raifmans were awarded $500,000 with respect to this investment, pursuant to their arbitration involving Mr. Ramos, Mr. Keys, and PCG. Accordingly, the proper year of loss is not 2008, as the Raifmans claim, but a later year that the record does not establish.

## III. Section 6662 Accuracy-Related Penalties

Respondent determined that for all years at issue the Raifmans were liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2) for negligence, disregard of rules or regulations, or substantial understatements of income tax. The Raifmans contest the imposition of these penalties.

A taxpayer is liable for a section 6662(a) accuracy-related penalty with respect to any portion of an underpayment attributable to negligence or disregard of rules and regulations, or a substantial understatement of income tax. Sec. 6662(a) and (b)(1) and (2). Negligence occurs when the taxpayer fails to make a reasonable attempt to comply with the provisions of the Code while disregard of

[*55] rules and regulations means any careless, reckless, or intentional disregard thereof. Sec. 6662(c); sec. 1.6662-3(b)(1)(ii), Income Tax Regs. (stating that a taxpayer exhibits negligence when he or she "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances"). A substantial understatement of income tax exists when the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to the accuracy-related penalty under section 6662. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

A.    Graev Implications

This case was tried during the Court's October 25, 2016, trial session in San Francisco, California. The record remained open until June 1, 2017. Before the court closed the record in this case, neither party attempted to introduce evidence with respect to the written supervisory approval requirement of section 6751(b)(1). Briefing was completed on December 1, 2017.[42]

---

[42]Shortly after the conclusion of trial, this Court released Graev v. Commissioner (Graev II), 147 T.C. 460 (2016), supplemented and overruled in

(continued...)

**[\*56]** On December 20, 2017, this Court released <u>Graev v. Commissioner</u> (<u>Graev</u> <u>III</u>), 149 T.C. __ (Dec. 20, 2017), <u>supplementing and overruling in part</u> 147 T.C. 460 (2016).  In <u>Graev III</u>, 149 T.C. at __ (slip op. at 14), as pertinent here, this Court held for the first time that as part of his burden of production the Commissioner must offer into the record evidence of his compliance with the written supervisory approval requirement of section 6751(b)(1).  On January 23, 2018, we ordered the parties to address the effect of <u>Graev III</u> on this case and to file any associated motions by February 15, 2018.[43]

On February 9, 2018, respondent filed a motion to reopen the record and the declaration of Theresa Alvarez in support of that motion (collectively, respondent's motion).  Revenue Agent Theresa Alvarez (RA Alvarez) was tasked with examining the Raifmans' returns for the years at issue.  Respondent's motion

---

[42](...continued)
part by <u>Graev v. Commissioner</u> (<u>Graev III</u>), 149 T.C. __ (Dec. 20, 2017), where we held that the Commissioner was only required to comply with the written supervisory approval requirement of sec. 6751(b)(1) before the actual assessment of applicable penalties.  At the close of the record, and through the completion of briefing, <u>Graev II</u> was controlling in this case.

[43]On January 29, 2018, respondent filed a response to our order dated January 23, 2018, notifying the Court that he had informed the Raifmans about the penalty approval form on January 23, 2018, and informing the Court and the Raifmans of his intent to file a motion to reopen the record.  <u>See</u> Fed. R. Evid. 902(11).

[*57] seeks to reopen the record to add documentary evidence that might establish his compliance with the written supervisory approval requirement of section 6751(b)(1).

Respondent's motion includes a "Penalty Approval Form" and "Negligence or Disregard of the Rules or Regulations Lead Sheet 6662(c)" (collectively, penalty approval form). The penalty approval form indicates that it was prepared by RA Alvarez with respect to her examination of the Raifmans' returns for the years at issue. A signature dated March 18, 2013, appears on the penalty approval form in the space provided for "Group Manager Approval to Assess Penalties Identified Above". In her declaration RA Alvarez states that this signature is that of her then-immediate supervisor, Robert Gee, and that she is already familiar with the signature of Mr. Gee, who regularly signed documents she had prepared during his tenure as her immediate supervisor. RA Alvarez additionally states that this penalty approval form was drafted contemporaneously with her examination of the Raifmans' returns for the years at issue and that these forms are of the type that employees of the IRS regularly create and keep in the course of ordinary business.

On February 15, 2018, the Raifmans filed a competing motion to reopen the record (Raifmans' motion). The Raifmans' motion objects to respondent's motion only insofar as the Raifmans request that any reopening of the record also afford

**[\*58]** them the opportunity to cross-examine Mr. Gee and to again cross-examine RA Alvarez.  To this extent, the Raifmans' motion argues that the penalty approval form fails to establish that RA Alvarez and Mr. Gee adequately considered their reasonable cause defense to the accuracy-related penalties under section 6662 for the years at issue.

On February 23, 2018, we ordered the parties to respond to these competing motions to reopen the record, and the parties complied.

The decision to reopen the record to admit additional evidence is a matter within the discretion of the trial court.  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); see also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974), aff'g T.C. Memo. 1971-200.  This Court, however, will not exercise such discretion unless the evidence that a party seeks to admit to the record is material and will aid the Court in determining the outcome of the case; the record will not be reopened to admit evidence that is merely cumulative or impeaching.  Butler v. Commissioner, 114 T.C. 276, 287 (2000), abrogated on other grounds, Porter v. Commissioner, 132 T.C. 203 (2009); see SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986).  Similarly, this Court will weigh the diligence of, and any prejudice to, the parties when disposing of motions to reopen the record.  See Estate of Freedman v. Commissioner, T.C. Memo. 2007-61, slip

**[\*59]** op. at 26-28; see also Purex Corp. v. Procter & Gamble Co., 664 F.2d 1105,

1109 (9th Cir. 1981) (citing Skehan v. Bd. of Trustees, 590 F.2d 470, 478 (3d Cir.

1978)).

The Raifmans' motion challenged neither the authenticity or admissibility of

the penalty approval form as a business record nor the associated declaration of

RA Alvarez.[44]  Additionally, the Raifmans do not argue that the grant of

respondent's motion would be improper in that the penalty approval form is

immaterial, cumulative, or impeaching.[45]  Instead, the Raifmans appear to argue

that they would be prejudiced if we admitted the penalty approval form without

giving them an opportunity to cross-examine RA Alvarez and Mr. Gee.  To this

extent, the Raifmans argue the penalty approval form is insufficient to establish

---

[44]As a preliminary matter, we hold that the penalty approval form is admissible in that the form is an admissible business record under Fed. R. Evid. 803(6).  See Fed. R. Evid. 902(11); see also Clough v. Commissioner, 119 T.C. 183, 190-191 (2002).  By the same measure, we hold that RA Alvarez sufficiently identified and established her familiarity with the signature of Mr. Gee.  See Fed. R. Evid. 901(b)(2).

[45]On the basis of this Court's holdings in Graev II and Graev III, see supra note 42, the record before us lacks any evidence upon which we may ascertain whether the Commissioner complied with the written supervisory approval requirement of sec. 6751(b)(1).  Accordingly, the penalty approval form is by its nature material and manifestly not cumulative, as admission of the penalty approval form into evidence would stand to influence this case's outcome by being the only record in evidence that might establish whether the Commissioner actually complied with the requirement of sec. 6751(b)(1).

[*60] whether RA Alvarez or Mr. Gee adequately considered the applicability of any reasonable cause penalty defense available to the Raifmans and that the only means of establishing such is through cross-examination.

Section 6751(b)(1) requires only that "the initial determination * * * [of the accuracy-related penalty be] personally approved (in writing) by the immediate supervisor" of the individual who determined that the penalty is applicable. We are not persuaded by the Raifmans' argument that additional cross-examination is necessary to avoid prejudice.

First, the penalty approval form, as documentary evidence offered as part of respondent's motion, will indicate that respondent either did or did not comply with the written supervisory approval requirement of section 6751(b)(1). We again note that the Raifmans' motion and subsequent response failed to challenge the penalty approval form or its attached declaration in any respect, evidentiary or otherwise. Absent such a prima facie challenge we are left with the conviction that admission of the penalty form would not prejudice the Raifmans, and that further cross-examination is unnecessary.

Second, to the extent the Raifmans request the opportunity to cross-examine RA Alvarez and Mr. Gee with respect to whether they adequately contemplated the Raifmans' reasonable cause defense, we determine that such a line of

[*61] questioning would be immaterial and wholly irrelevant to ascertaining whether respondent complied with the written supervisory approval requirement of section 6751(b)(1) or the merits of the Raifmans' reasonable cause defense to accuracy-related penalties under section 6662 for the years at issue. The written supervisory approval requirement of section 6751(b)(1) requires just that: written supervisory approval. We decline to read into section 6751(b)(1) the subtextual requirement advocated by the Raifmans in their request for additional cross-examination. Similarly, we believe it would be imprudent for this Court to now begin examining the propriety of the Commissioner's administrative policy or procedure underlying his penalty determinations. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328-329 (1974).[46] Thus, we cannot conclude that the Raifmans would be prejudiced.

Accordingly, respondent's motion will be granted and the penalty approval form is received into evidence. The Raifmans' motion will be denied. Recognizing the parties concessions, and in the light of our holdings above and

---

[46]The rule stated by this Court in Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324 (1974), predates the addition of the written supervisory approval requirement of sec. 6751(b)(1) to the Code. Congress understood the longstanding rule of Greenberg's Express when it enacted sec. 6751(b)(1) and at that time did not deem it necessary to expand our jurisdiction or overturn our precedent, as the Raifmans advocate here. See Lorillard v. Pons, 434 U.S. 575, 580 (1978).

[*62] our discussion below, we hold that respondent has satisfied his burden of production.

### B.  Reasonable Cause, Justified Reliance

Once the Commissioner meets his burden, the burden of proof is on the taxpayer to prove that the application of the penalty is inappropriate.  See Higbee v. Commissioner, 116 T.C. at 446-447.  The Raifmans argue that the accuracy-related penalties are inappropriate, as they acted with reasonable cause and in good faith in relying on the tax advice of Mr. Ramos and Mr. Shaw.

The accuracy-related penalty will not apply to any portion of the underpayment for which a taxpayer establishes that he or she had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances, including his or her efforts to assess the proper tax liability, the knowledge and experience of the taxpayer, and the extent to which he or she relied on the advice of a tax professional.  See sec. 1.6664-4(b)(1), Income Tax Regs.

A taxpayer acts with reasonable cause when he or she exercises ordinary business care and prudence with respect to a disputed tax item.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d

[*63] Cir. 2002). Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer acts in good faith when he or she acts upon honest belief and with intent to perform all lawful obligations. See Rutter v. Commissioner, T.C. Memo. 2017-174, at *45.

A taxpayer alleging reasonable, good-faith reliance on the advice of an independent, competent professional must prove that (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs, P.A. v. Commissioner, 115 T.C. at 99. A taxpayer's unconditional reliance on an otherwise qualified professional does not constitute reasonable reliance in good faith for purposes of section 6664(c)(1). See Stough v. Commissioner, 144 T.C. 306, 323 (2015). A taxpayer asserting reasonable reliance must show that the opinion of a qualified adviser took into account all facts and circumstances and was not based on unreasonable facts or legal assumptions. Sec. 1.6664-4(c)(1), Income Tax Regs. Similarly, a taxpayer cannot reasonably rely on the professional advice of an individual the taxpayer knows, or should know, to be an insider or a promoter of a particular tax scheme, or to have

**[*64]** an inherent conflict of interest. <u>New Phoenix Sunrise Corp. v. Commissioner</u>, 132 T.C. 161, 193-195 (2009), <u>aff'd</u>, 408 F. App'x 908 (6th Cir. 2010); <u>Marine v. Commissioner</u>, 92 T.C. 958, 992-993 (1989), <u>aff'd without published opinion</u>, 921 F.2d 280 (9th Cir. 1991).

First, we observe that the Raifmans jettisoned their former C.P.A. after electing to engage in the ClassicStar and Derivium programs and shortly after Mr. Ramos had presented that C.P.A. with materials regarding the Raifmans' participation in the ClassicStar program. Following this parting of ways the Raifmans turned to Mr. Ramos for referral to a return preparer. Mr. Ramos, the individual who sold the Raifmans on the transactions at issue, had a professional interest in delivering the Raifmans a return preparer who would respect those transactions, particularly as they had not sought or secured any legal or tax advice before engaging in them. Accordingly, Mr. Ramos referred the Raifmans to Mr. Shaw, who they hired sight unseen.

Second, as Mr. Shaw's testimony and the remainder of the record illustrate, Mr. Shaw did not provide the Raifmans with any actual independent and objective tax advice. Mr. Shaw did not examine the substance of any of the transactions which the Raifmans had hired him to report on. Indeed, Mr. Shaw's engagement with the Raifmans expressly limited the scope of his responsibilities. Any

[*65] independent advice that Mr. Shaw may have rendered was not based on his own review of all pertinent facts and circumstances. Mr. Shaw, instead, closely coordinated with Mr. Ramos, and other promoters, in his preparation and defense of the Raifmans' returns for the years at issue and assumed the veracity of the factual and legal representations of those individuals.[47]

Additionally, we observe that the Raifmans are sophisticated individuals whose experience and savvy ought to have clued them in, early on, to the reality that the tax benefits touted by the Derivium and ClassicStar programs were too good to be true. With respect to the Derivium transaction, the Raifmans directed Mr. Ramos to review the program with an outside adviser, a licensed C.P.A. and attorney, an attorney who declined to engage in any such review. Undaunted, the Raifmans sought no further expertise, consulted no other professionals, and engaged in a series of Derivium transactions despite their own misgivings. More egregiously, the Raifmans sought no outside counsel, with respect to the tax benefits of the ClassicStar program before choosing to participate in the program.

[47]With respect to the Raifmans' originally claimed deduction for a $15 million theft loss for tax year 2008, Mr. Shaw testified, without elaboration, that he determined this deduction would be proper pursuant to the arbitration decision. We observe that Mr. Shaw's determination in this regard similarly relies on unreasonable assumptions with respect to the deduction claimed or completely disregards rules and regulations which proscribe deductions for theft losses until no reasonable prospect of recovery exists.

[*66] To this extent, the Raifmans' assertion of reliance on the advice of Mr. Shaw is again unreasonable, as their actions reveal a lack of reasonable business care and prudence on their part.  See Neonatology Associates, P.A. v. Commissioner, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."); New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. at 195.

On the record before us, any objective and independent advice the Raifmans may have received did not come from Mr. Shaw.  The Raifmans engaged Mr. Shaw as a strictly prophylactic measure.  To the extent Mr. Shaw rendered any advice, the Raifmans either knew, or should have known, that such advice was moored to the representations of Mr. Ramos and others riddled with conflicts stemming from their roles as promoters and insiders of the transactions at issue. Thus, any reliance on Mr. Shaw is objectively unreasonable.  Accordingly, we sustain respondent's determination that petitioners are liable for accuracy-related penalties for the years at issue, consistent with our holdings above.

**[*67]** To reflect the foregoing,

<u>An appropriate order will be</u>

<u>issued, and decision will be entered</u>

<u>under Rule 155</u>.